1   CUAUHTEMOC ORTEGA (Bar No. 257443)
    Federal Public Defender
2   TERRA CASTILLO LAUGHTON (Bar No. 321683)
    (E-Mail: terra_laughton@fd.org)
3   Deputy Federal Public Defender
    411 West Fourth Street, Suite 7110
4   Santa Ana, California 92701-4598
    Telephone: (714) 338-4500
5   Facsimile: (714) 338-4520

6   Attorneys for Defendant
    RENE RODRIGUEZ
7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                          **SOUTHERN DIVISION**

11

| | |
|---|---|
| 12   UNITED STATES OF AMERICA, | Case No. 8:23-cr-00123-DOC |
| 13              Plaintiff, | **DEFENDANT'S NOTICE OF MOTION AND MOTION TO** |
| 14        v. | **SUPPRESS DEFENDANT'S STATEMENTS AND RELATED EVIDENCE; EXHIBITS** |
| 15   RENE RODRIGUEZ. | |
| 16              Defendant. | Hearing Date: 7/22/24 at 1:30 p.m. |
| 17 | Trial Date: 8/6/24 Status Conference: None |

18

19        PLEASE TAKE NOTICE that on July 22, 2024 at 1:30 p.m., or as soon

20   thereafter as counsel may be heard in the courtroom of the Honorable David O. Carter,

21   United States District Judge, Defendant Rene Rodriguez, by and through his attorney of

22   record Deputy Federal Public Defender Terra Castillo Laughton, will and does hereby

23   move this Court for an order suppressing his statements to law enforcement on March

24   9, 2018 and related evidence.

25

26

27

28

## MOTION

Defendant Rene Rodriguez, by and through his attorney of record, Deputy Federal Public Defender Terra Castillo Laughton, hereby moves for an order suppressing all statements made by Mr. Rodriguez to state and/or federal law enforcement officers on March 9, 2018, as well as any evidence derived from those statements.

This motion is made pursuant to the Fifth Amendment, the Fourth Amendment, and the Due Process Clause of the U.S. Constitution and is based upon the attached memorandum of points and authorities, the exhibits submitted herewith, including the declaration of Mr. Rodriguez, all files and records in this case, and such evidence and argument as may be presented at the hearing on this motion.

The parties conferred regarding this Motion on multiple occasions, including June 18, 2024 and June 20, 2024.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: June 24, 2024          By  /s/ Terra D. Castillo Laughton

Terra Castillo Laughton
Deputy Federal Public Defender
Attorney for Rene Rodriguez

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................... 1

II. BACKGROUND ...................................................................................................... 2

    A.    The Government's Investigation Purportedly Revealed Someone Had Used the Apartment's IP Address to Share Child Pornography Seven Months Earlier. ................................................................................................ 2

    B.    Fifteen Armed Agents Executed the Search Warrant on March 9, 2018. ... 2

    C.    Agents Interrogated Members of the Household Without Advising Them of Their *Miranda* Rights. ...................................................................... 3

        1.    Mr. Rodriguez Was Interrogated for Nearly Twenty Minutes Without Being Advised of His *Miranda* Rights. ............................... 3

        2.    Mr. Rodriguez Was Interrogated a Second Time, Still Without Being Read His *Miranda* Rights ............................................................ 5

III. ARGUMENT .......................................................................................................... 6

    A.    The Government Bears the Burden to Show Valid *Miranda* Warnings Were Given and Were Properly Waived. ...................................................... 6

    B.    This Court Should Suppress Mr. Rodriguez's Statements Because Officers Interrogated Him in a Custodial Setting Without First Advising Him of His *Miranda* Rights. ........................................................ 6

        1.    Officers were required to advise Mr. Rodriguez of his *Miranda* rights prior to any custodial interrogation. ........................................ 6

        2.    Mr. Rodriguez was in custody because he was interrogated in his home, which had become a police-dominated setting. ................. 7

            (1)    Number of law enforcement personnel and whether they were armed ........................................................... 8

            (2)    Whether the suspect was at any point restrained, either by physical force or threats ............................... 10

            (3)    Whether the suspect was isolated from others ........... 12

            (4)    Whether the suspect was informed that he was free to leave ........................................................................ 13

        3.    Apart from the *Miranda* Violation, Mr. Rodriguez's Statements were Involuntary ....................................................................... 15

        4.    The Search Warrant's Execution was Unreasonable, in Violation of the Fourth Amendment ........................................................... 16

    C.    Exclusion of All Evidence and Statements is an Appropriate Remedy for the *Miranda* Violations, Lack of Voluntariness, and Grossly Unreasonable Manner of Search ................................................................. 19

i

# TABLE OF CONTENTS

Page

D.    Any Evidence Obtained From Mr. Rodriguez's Statements Must Also Be Suppressed. ..............................................................20

IV. CONCLUSION .........................................................................20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

Page(s)

1

**Federal Cases**

2

3

*Arizona v. Fulminante,*
    499 U.S. 279 (1991)................................................................16

4

5

*Baker v. Monroe Township,*
    50 F.3d 1186 (3d Cir. 1995) ....................................................17

6

7

*Bellotte v. Edwards,*
    629 F.3d 415 (4th Cir. 2011) ...................................................19

8

9

*Brown v. Mississippi,*
    297 U.S. 278 (1936)................................................................16

10

*Dickerson v. United States,*
    530 U.S. 428 (2000)..................................................................6

11

12

*Estate of Smith v. Marasco,*
    430 F.3d 140 (3d Cir. 2005) ....................................................17

13

14

*Florida v. Jardines,*
    569 U.S. 1 (2013)....................................................................16

15

16

*Graham v. Connor,*
    490 U.S. 386 (1989)................................................................17

17

18

*Herring v. United States,*
    555 U.S. 135 (2009)................................................................19

19

20

*Holland ex rel. Overdorff v. Harrington,*
    268 F.3d 1179 (10th Cir. 2001) ...............................................17

21

*Jackson v. Denno,*
    378 U.S. 368 (1964)................................................................16

22

23

*Lego v. Twomey,*
    404 U.S. 477 (1972)................................................................16

24

25

*McDonald v. Haskins,*
    966 F.2d 292 (7th Cir. 1992) ...................................................17

26

27

*Miranda v. Arizona,*
    384 U.S. 436 (1966)..........................................................*passim*

28

# <u>TABLE OF AUTHORITIES</u>

Page(s)

*Muehler v. Mena*,
    544 U.S. 93 (2005)................................................................................17

*Payton v. New York*,
    445 U.S. 573 (1980).........................................................................1, 16

*Rhode Island v. Innis*,
    446 U.S. 291 (1980)..............................................................................7

*Richards v. Wisconsin*,
    520 U.S. 385 (1997)............................................................................17

*Simmons v. United States*,
    390 U.S. 377 (1968).............................................................................2

*Terebesi v. Torreso*,
    764 F.3d 217 (2d Cir. 2014) ...............................................................17

*United States v. Banks*,
    540 U.S. 31 (2003).............................................................................17

*United States v. Brobst*,
    558 F.3d 982 (9th Cir. 2009) ................................................................9

*United States v. Cantu*,
    230 F.3d 148 (5th Cir. 2000) ..............................................................19

*United States v. Craighead*,
    539 F.3d 1073 (9th Cir. 2008) ....................................................*passim*

*United States v. Crawford*,
    372 F.3d 1048 (9th Cir. 2004) (*en banc*)............................................20

*United States v. Gladney*,
    2009 WL 175157 (C.D. Cal. Jan. 23, 2009)................................10, 15

*United States v. Griffin*,
    922 F.2d 1343 (8th Cir. 1990) ...........................................................12

*United States v. Harrison*,
    34 F.3d 886 (9th Cir. 1994) .............................................................6, 16

*United States v. Millan*,
    36 F.3d 886 (9th Cir. 1994) ................................................................20

## <u>TABLE OF AUTHORITIES</u>

Page(s)

*United States v. Ramirez*,
    523 U.S. 65 (1998)...................................................................................1, 16, 17

*United States v. Salceda*,
    2012 WL 763583 (C.D. Cal. Feb. 27, 2012) .........................................10, 12, 15

*United States v. Song*,
    544 F. Supp. 3d 929 (N.D. Cal. 2021)...................................................................10

*United States v. Tang Juan*,
    2021 WL 2212235 (E.D. Cal. June 1, 2021) ...........................................................9

*United States v. Thompson*,
    667 F. Supp. 2d 758 (S.D. Ohio 2009)...................................................................17

*Withrow v. Williams*,
    507 U.S. 680 (1993) ...................................................................................................6

*Wong Sun v. U.S.*,
    371 U.S. 471 (1963)...................................................................................................20

**Federal Statutes**

18 U.S.C. § 3501 ...................................................................................................................6

**Other Authorities**

Fifth Amendment ................................................................................2, 6, 7, 15

Fourth Amendment ..........................................................................................*passim*

Kevin Sack, *Door-Busting Drug Raids Leave a Trail of Blood*, N.Y.
    Times, March 18, 2017, *available at* https://nyti.ms/3fZCwM9 ......................19

Local Criminal Rule 12-1.1 ...............................................................................2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

As the Ninth Circuit has recognized, the generally-applicable inquiry for determining whether a defendant is in custody for purposes of *Miranda*—whether the defendant would feel free to leave—is necessarily modified when the interrogation occurs in the defendant's home. *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008) ("To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home."). Indeed, the home lies "at the very core" of the Fourth Amendment's protections, which scrupulously guard the historic "right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Payton v. New York*, 445 U.S. 573, 589-90 (1980) (internal quotation omitted). And even when officers have a search warrant for a home, the Fourth Amendment's "general touchstone of reasonableness . . . governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citation omitted).

The government disregarded those principles here. At 6:00 a.m. one morning in March of 2018, fifteen armed agents representing five distinct agencies invaded the apartment where Mr. Rodriguez lived with his then-wife, their infant son, and other members of their family—none of whom were believed to be violent or dangerous. The agents entered the home and pointed guns at Mr. Rodriguez and others. They handcuffed Mr. Rodriguez and led him outside to an unmarked vehicle. He was left there, separated from his family, for several minutes before being brought back inside the home and having his handcuffs removed. All of this understandably terrified Mr. Rodriguez.

Only then did agents tell Mr. Rodriguez they wanted to ask him some questions. They brought him alone to a small bedroom, with only one point of entry and exit. They closed the door behind them and, with two agents present, proceeded to interrogate him. They did this twice. At no point did they read Mr. Rodriguez his

1

*Miranda* rights.  Under well-established Ninth Circuit precedent, Mr. Rodriguez's subsequent, un-*Mirandized* statements are inadmissible under the Fifth Amendment and due process.  Moreover, the method of executing the search warrant—including the early morning hour, the number of agents, and their show of force—was also unreasonable.  The Court should therefore exclude all evidence and statements obtained from the government's search.

## II. BACKGROUND

### A.    The Government's Investigation Purportedly Revealed Someone Had Used the Apartment's IP Address to Share Child Pornography Seven Months Earlier.

The investigation that preceded the execution of the search warrant on March 9, 2018 is summarized in greater detail in Mr. Rodriguez's motion to suppress under the Fourth Amendment, filed concurrently herewith.  In summary, and as articulated in the government's search warrant application, an individual identified as "talleyho14" sent a Dropbox link containing suspected child pornography to an undercover officer on the Kik mobile messaging application on August 12, 2017.  The government traced an IP address associated with the "talleyho14" account, and found it was assigned to "Maca Ortiz" at 3052 West Cheryllyn Lane in Anaheim.  On March 5, 2018, the government obtained a search warrant for that address.

### B.    Fifteen Armed Agents Executed the Search Warrant on March 9, 2018.

At 6:00 a.m. on March 9, 2018, fifteen officers from five different agencies—FBI, CHP, LAPD, LADA, and LASD—arrived at Mr. Rodriguez's home.  *See* Ex. 2.  The apartment consists of three bedrooms, two bathrooms, and a small kitchen and living room.  Ex. 1 (Decl. of Mr. Rodriguez) at ¶ 3.[1]  The entire apartment is just over 1,000 square feet.  Ex. 3.

---

[1] The declaration of Mr. Rodriguez, required under Local Criminal Rule 12-1.1, is provided pursuant to *Simmons v. United States*, 390 U.S. 377, 390-394 (1968), and Mr. Rodriguez does not waive his Fifth Amendment privilege.

2

When the agents arrived, Mr. Rodriguez and his family were asleep in their beds. Ex. 1 at ¶4.  The agents knocked loudly and banged on the door.  *Id.*  Mr. Rodriguez and his family made their way into the living room and someone let the agents inside. *Id.* at ¶5.  Although the officers stated they had a warrant, they did not provide it or show it at this point.  *Id.* at ¶4.  Once in the living room, the agents pointed rifles at each family member.  *Id.* at ¶5.  Mr. Rodriguez was terrified.  *Id.*

An agent put handcuffs on Mr. Rodriguez.  *Id.* at ¶6.  He was led out of the apartment, down the stairs, and placed into an unmarked car.  *Id.*  He was alone in the car; there were no family members or agents with him.  *Id.*  Mr. Rodriguez was left in this position, without explanation or updates, for at least five minutes.  *Id.* at ¶¶ 6-7.  At some point, Mr. Rodriguez was taken out of the car, back up the stairs, and into his apartment.  *Id.* at ¶7.  Once he was back inside, an agent removed his handcuffs.  *Id.*

Mr. Rodriguez then sat on the couch in his living room with his family.  *Id.* at ¶8. In the meantime, numerous agents, all of whom were armed with a handgun or rifle, continued searching the apartment.  *Id.*  Mr. Rodriguez and his family were told they could not leave the apartment while the agents were searching.  *Id.*  While they sat, at least one armed agent stood guard.  *Id.*

## C.    Agents Interrogated Members of the Household Without Advising Them of Their *Miranda* Rights.

At some point, the agents began interrogating Mr. Rodriguez's family.  One by one, they took Mr. Rodriguez's mother, then Mr. Rodrigez, then his wife at the time, to the master bedroom to interrogate them.

### 1.    Mr. Rodriguez Was Interrogated for Nearly Twenty Minutes Without Being Advised of His *Miranda* Rights.

When it was Mr. Rodriguez's turn, the agents told him they wanted to ask him some questions.  They took him into the master bedroom—a room with a single point of entry and exit.  Ex. 1 at ¶9.  Two agents sat in the room with him, and they closed

3

the door behind him.  *Id.*  In that enclosed space, they began interrogating Mr. Rodriguez.  At no point did they read him his *Miranda* rights.  *Id.* at ¶12.

In the course of the first interrogation, which lasted about 20 minutes, the agents asked Mr. Rodriguez questions such as:

- What do you use your cell phone for?
- Do you have social media?
- Do you have any messaging apps like WhatsApp or Kik?
- What kind of phone do you have?
- Where's your phone?
- What about the living room computer? Who uses that?
- Are there any other computers in the house that you know of?

Ex. 4.  They also asked whether Mr. Rodriguez has a Dropbox account or any other cloud storage account and who uses various devices.  Exs. 4 & 5.[2]

In addition, the following exchange occurred:

> **Agent Trapp**: What kind of car do you have?
>
> **Mr. Rodriguez**: Uh, Jeep.
>
> **Agent Trapp**: Oh, Jeep.
>
> **Mr. Rodriguez**: Yeah.
>
> **Agent Trapp**: Hey, we just don't want to miss anything. Would you let us look in there and make sure there's no evidence of what we're looking- You know what we're looking for now.
>
> **Mr. Rodriguez**: Right.
>
> **Agent Trapp**: So would you let us look in there and s- Make sure there's nothing uh-
>
> **Mr. Rodriguez**: Does the search warrant cover that?

---

[2] Mr. Rodriguez's first interrogation is split into two video recordings.  Those recordings are lodged concurrently herewith as Exhibits 4 and 5.

**Agent Trapp**: Um…It doesn't look- It doesn't include the vehicles.

**Agent Whitman**: Not the vehicles specifically.

**Mr. Rodriguez**: Then I'm sorry. I'm not gonna- I'm not gonna give you consent to search.

**Agent Trapp**: Okay.

Ex. 4 at 7:11:08-7:11:36 a.m.

### 2.    Mr. Rodriguez Was Interrogated a Second Time, Still Without Being Read His *Miranda* Rights.

After the agents concluded their first interrogation of Mr. Rodriguez—and notwithstanding their statements that the search warrant did not permit them to search his car—they searched it anyway.  They then waited for Mr. Rodriguez outside the bathroom door while he was using the restroom.  Ex. 6.  When he was done, the agents asked to talk to him again and escorted him back into the bedroom.  Again, they closed the door behind them.  Ex. 1 at ¶11.  And again, two agents were present in the small, enclosed space.  *Id.*

During the second interrogation, the agents informed Mr. Rodriguez that they had found two phones in his Jeep.  Ex. 6.  They asked him questions about the phones, including whom they belonged to and whether they were Mr. Rodriguez's devices.  Again, they did so without advising him of his *Miranda* rights.

In the government's execution of the search warrant, agents seized 18 devices in all.  Fifteen of them were later returned because nothing of evidentiary value was found on them.  The agents left the apartment around 9:35am.  Ex. 2.  They had spent three and a half hours there.

### III. ARGUMENT

**A.    The Government Bears the Burden to Show Valid *Miranda* Warnings Were Given and Were Properly Waived.**

The government bears the burden of demonstrating that valid *Miranda* warnings were given, and that they were waived knowingly, intelligently, and voluntarily, *before* any custodial interrogation occurred.  *See United States v. Harrison*, 34 F.3d 886, 890 (9th Cir. 1994); *see also Dickerson v. United States*, 530 U.S. 428, 439-41 (2000); 18 U.S.C. § 3501.  The government also bears the burden of proving that a defendant's statements were uncoerced and voluntary under 18 U.S.C. § 3501(a) and the Due Process Clause of the Fifth Amendment.  Because the government cannot meet its burden of demonstrating that adequate *Miranda* warnings were given and that Mr. Rodriguez knowingly and intelligently waived those rights, his statements must be suppressed.  *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

**B.    This Court Should Suppress Mr. Rodriguez's Statements Because Officers Interrogated Him in a Custodial Setting Without First Advising Him of His *Miranda* Rights.**

**1.    Officers were required to advise Mr. Rodriguez of his *Miranda* rights prior to any custodial interrogation.**

Because the Fifth Amendment privilege against self-incrimination is "jeopardized" during a custodial interrogation, the Supreme Court has adopted "[p]rocedural safeguards . . . to protect the privilege." *Miranda*, 384 U.S. at 478-79. "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [the defendant]." *Id.*; *see also Withrow v. Williams*, 507 U.S. 680, 690 (1993); *Harrison*, 34 F.3d at 890 ("The government must prove by a preponderance of the evidence that the statement was voluntary.").

*Miranda* warnings are required prior to any custodial interrogation.  Custodial interrogation is questioning initiated by law enforcement officers after a person has

1    been taken into custody or otherwise deprived of his freedom of action in any

2    significant way.  *Craighead*, 539 F.3d at 1082.  Interrogation, for purposes of *Miranda*,

3    is any activity by law enforcement officers "reasonably likely to elicit an incriminating

4    response."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

5        It is undisputed that Mr. Rodriguez was not advised of his *Miranda* rights before

6    he was interrogated.  *Craighead*, 539 F.3d at 1082.  Therefore, the only issue is whether

7    Mr. Rodriguez was "in custody at the time of his interrogation," such that *Miranda*

8    warnings were required.  *Id.*

9                **2.    Mr. Rodriguez was in custody because he was interrogated**

10                       **in his home, which had become a police-dominated setting.**

11        Mr. Rodriguez was interrogated in his home after having been handcuffed,

12   separated from his family, and unfree to leave, while being surveilled by armed officers

13   as other officers searched through his home.  Where, as here, the home becomes a

14   police-dominated environment, a defendant is in custody for *Miranda* purposes.  *Id.* at

15   1083.

16        *United States v. Craighead*, is on all fours with this case.  There, the Ninth

17   Circuit addressed a question of first impression in the Circuit: "under what

18   circumstances under the Fifth Amendment does an interrogation by law

19   enforcement officers in the suspect's *own home* turn the home into such a police-

20   dominated atmosphere that the interrogation becomes custodial in nature and

21   requires *Miranda* warnings?"  *Id.* at 1077 (emphasis added).  The Court

22   recognized that the normal inquiry for determining whether a defendant is in

23   custody for *Miranda* purposes—whether the defendant would feel free to leave—

24   "presents some analytical challenges" when applied to a defendant's home.  *Id.* at

25   1082.  As the court observed, "[t]o be 'free' to leave is a hollow right if the one

26   place the suspect cannot go is his own home."  *Id.* at 1083.

27        The Court determined that "an interrogation in the suspect's home may be found

28   to be custodial under certain circumstances."  *Id.*  In this context, the ultimate inquiry is

"the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere,'" an approach the Ninth Circuit noted was consistent with many other Circuits. *Id.* at 1083-84 (collecting cases).

To aid courts in analyzing this "necessarily fact intensive" inquiry, the Ninth Circuit set forth the following list of non-exhaustive factors:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

*Id.* at 1084.

Applying these factors to the facts of *Craighead*, the Ninth Circuit found that three of the four factors weighed in favor of finding that the defendant was in custody. *Id.* at 1088. Although one factor—that an agent had told the defendant he was free to leave—weighed the other way, Court nevertheless concluded that Mr. Craighead's home had become a police-dominated atmosphere and held his statements should have been suppressed. *Id.* As discussed below, the same factors lead to the same conclusion here, where the facts were even more egregious than in *Craighead*.

### (1)   Number of law enforcement personnel and whether they were armed

"[T]he presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere." *Id.* at 1085. "When the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will he stopped by one of the many officers he will encounter on the way out." *Id.* at 1084-85.

Fifteen officers from five different agencies executed the search warrant at Mr. Rodriguez's home. *See* Ex. 2. They arrived around 6:00 a.m., when Mr. Rodriguez and his family were asleep in their beds. Ex. 1 at ¶4. The agents entered the home and pointed rifles at Mr. Rodriguez and his family members, who had made their way into the living room when they heard loud banging and knocking at the door. *Id.* at ¶5. This terrified Mr. Rodriguez. *Id.* Then, an agent handcuffed Mr. Rodriguez before leading him out of the apartment, down the stairs, and into a police vehicle. *Id.* at ¶6. Such a large number of officers in a roughly 1,000-square foot apartment leaves "no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation." *Craighead*, 539 F.3d at 1084. In any event, Mr. Rodriguez was not permitted to enter and leave the home as he wished anyway. Ex. 1 at ¶¶8, 10. He was eventually told that he could leave but would not be allowed to reenter until the agents were done. Ex. 4. The officers were also visibly armed; Mr. Rodriguez could see that even the officers who did not draw their weapons had firearms on them. Ex. 1 at ¶8.

The circumstances of this case are even more concerning than the facts of *Craighead*, where there were 8 officers present from 3 different agencies—nearly half of the 15 agents from 5 agencies present here—and no one pointed a gun at Mr. Craighead. *Craighead*, 539 F.3d at 1085.[3] A reasonable person in Mr. Rodriguez's situation "would feel that his home was dominated by law enforcement agents and that they had come prepared for a confrontation." *Id.*

The presence of smaller numbers of officers has been found to weigh in favor of a finding of custody. *See United States v. Brobst*, 558 F.3d 982, 988 (9th Cir. 2009) (defendant in child pornography case was in custody during his in-home interrogation where three officers were present); *United States v. Tang Juan*, 2021 WL 2212235 at *4 (E.D. Cal. June 1, 2021) (finding two FBI agents in an 800-square-foot apartment

---

[3] In addition to the eight law enforcement officers, there were two other individuals present at the search warrant execution in *Craighead*. *Id.*

9

weighed in favor of custody and ultimately suppressing defendant's statements); *see also United States v. Salceda*, 2012 WL 763583, at * 4 (C.D. Cal. Feb. 27, 2012) (applying *Craighead* in child pornography case and finding the presence of "eight armed ICE agents and two additional local police escorts" weighed in favor of finding that defendant was in custody in his own home); *United States v. Gladney*, 2009 WL 175157, at * 6 (C.D. Cal. Jan. 23, 2009) (suppressing statements where "at least a dozen armed law enforcement personnel" entered defendant's apartment and where defendant "stated that he was terrified that he would be either killed or hurt by the agents"); *United States v. Song*, 544 F. Supp. 3d 929, 933 (N.D. Cal. 2021) (finding defendant in custody where nine FBI agents arrived, six agents drew weapons, and at least one agent pointed a firearm at defendant's house).

Thus, the first factor weighs strongly in favor of a finding of custody.

### (2)     Whether the suspect was at any point restrained, either by physical force or threats

"When law enforcement agents restrain the ability of the suspect to move—particularly through physical restraints, but also through threats and intimidation—a suspect may reasonably feel he is subject to police domination within his own home and thus not free to leave or terminate the interrogation." *Craighead*, 539 F.3d at 1085. As *Craighead* recognizes, it is not required that the defendant be handcuffed.  Officers may exert control by acting as if the defendant is not free to leave, blocking his exit from the home or the driveway, or escorting and monitoring the suspect at all times.  *Id.* (collecting cases).  Indeed, the defendant in *Craighead* himself was not handcuffed or physically restrained at all, and the court still found this factor weighed in favor of finding he was in custody.  *Id.* at 1086.

In this case, the second factor weighs even more strongly in Mr. Rodriguez's favor.  When law enforcement entered his living room, they pointed rifles at him and his family and then handcuffed him.  Ex. 1 at ¶¶5-6.  They escorted him out the front door, down the stairs, and put him in the back of a police vehicle.  *Id.* at ¶6.  They left

him alone in this position for at least five minutes.  *Id*. at ¶7.  During this entire period, Mr. Rodriguez was physically restrained by law enforcement, under their complete control, and unable to reenter his home or even communicate with anyone.  The officers gave no indication of how long he would be kept in that position or what was happening.  Even when Mr. Rodriguez was removed from the car and brought back inside the apartment, at least one armed officer stood guard, watching him and his family at all times.  *Id*. at ¶8.  To a lay person, all of these actions are consistent with the process of being arrested.

Even though the defendant in *Craighead* was not handcuffed, the Ninth Circuit nonetheless found that this factor supported a finding of custody because, for his interrogation, Mr. Craighead was "escorted to a back storage room and the door was closed behind him." *Craighead*, 539 F.3d at 1086.  Mr. Craighead testified that he did not feel free to leave in part because one of the officers present during his interrogation leaned against the door blocking his exit.  *Id.*  In the Court's view, Mr. Craighead's "freedom of action was restrained in a way that increased the likelihood that Craighead would succumb to police pressure to incriminate himself." *Id.*  The Court concluded that "it was certainly objectively reasonable for Craighead to believe he was under guard." *Id.*

Here, the officers interrogated Mr. Rodriguez in very similar circumstances. After they had dominated his home for about an hour, they had Mr. Rodriguez leave his family to come into a bedroom so that they could talk to him.  The bedroom had a single entry and exit point.  Ex. 1 at ¶9.  Once Mr. Rodriguez entered the room, the agents closed the one and only door to the rest of the house.  *Id.*  Mr. Rodriguez was outnumbered 2:1 by agents in the small, enclosed space.  *Id.*  Under these facts, his freedom was clearly "restrained in a way that increased the likelihood that [he] would succumb to police pressure to incriminate himself." *Craighead*, 539 F.3d at 1086.

And critically, by the time his interrogation commenced, Mr. Rodriguez had already been physically removed from inside of his home, handcuffed, and made to sit

11

in the back of a police vehicle apart from his family.  Ex. 1 at ¶¶6-7.  In addition, the manner in which the officers had originally entered the home, by banging on the door while the family was sleeping, training weapons on Mr. Rodriguez and others, and handcuffing Mr. Rodriguez, *id.* at ¶¶4-5, would "certainly" have made it "objectively reasonable for [Mr. Rodriguez] to believe he was under guard."  *Craighead*, 539 F.3d at 1084, 1086.

It is no answer for the government to argue that physical control of the suspect is "necessary to preserve evidence and protect the safety of the agents" during this kind of operation.  *Id.* at 1086.  As the Ninth Circuit held in *Craighead*, these precautions do not "lessen their tendency to make a reasonable person believe he is in custody."  *Id.* To the contrary: assuming these precautions were necessary, the government "could have chosen to postpone the interrogation until a non-custodial moment, or to Mirandize [the suspect]."  *Id.* (quoting *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007)).  But here, they did neither.

The second factor weighs heavily in favor of finding Mr. Rodriguez was in custody for *Miranda* purposes.  *See Salceda*, 2012 WL 763583, at *4 (factor weighed in favor of a finding of custody even where defendant was not restrained but "he and his wife were monitored and escorted throughout their home during the duration of the agents' search").

### (3)    Whether the suspect was isolated from others

As the Ninth Circuit noted in *Craighead*, the Supreme Court "highlighted isolation from the outside world as perhaps *the crucial factor* that would tend to lead a suspect to feel compelled to provide self-incriminating statements."  539 F.3d at 1086-87 (emphasis added); *see also United States v. Griffin*, 922 F.2d 1343, 1352 (8th Cir. 1990) ("A frequently recurring example of police domination concerns the removal of the suspect from the presence of family . . . who might lend moral support during the questioning and deter a suspect from making inculpatory statements").  Indeed, "the law enforcement technique of isolating the suspect from family and friends is one of the

12

distinguishing features of a custodial interrogation." *Craighead*, 539 F.3d at 1087 (citing *Miranda*, 384 U.S. at 445-46).

Mr. Rodriguez was isolated three separate times—more than the single time the defendant was separated from his family in *Craighead*. First, Mr. Rodriguez was separated from his family when he was handcuffed, removed from the apartment, and placed in the back of a police vehicle. Ex. 1 at ¶6. Second, he was isolated from his family during his first interrogation in the enclosed bedroom. *Id.* at ¶6. Third, he was separated from his family after the officers had searched his vehicle, waited for him outside of the bathroom, and had him reenter the bedroom for a second interrogation. *Id.* at ¶11. Mr. Rodriguez's wife, mother, and infant son could have provided him with emotional support under the circumstances. But law enforcement ensured he would be isolated from any such support at critical moments.

Under these facts, the third factor clearly weighs strongly in favor of a finding that Mr. Rodriguez was in custody.

### (4) Whether the suspect was informed that he was free to leave

Lastly, the court considers "whether the suspect was informed that questioning was voluntary and that he was free to leave or terminate the interview." *Craighead*, 539 F.3d at 1087. But critically,"[t]he mere recitation of the statement that the suspect is free to leave or terminate the interview . . . *does not render an interrogation non-custodial per se*," and such statements must be considered "within the context of the scene as a whole." *Id.* at 1088 (emphasis added). "[A]n agent's statement that a suspect is free to leave may have more or less resonance with the suspect depending on whether he can leave the interrogation site and retreat to the safety of his home or whether his home is in fact the locus of police activity." *Id.*

More than two minutes into Mr. Rodriguez's first interrogation, inside a closed bedroom in which he was outnumbered by two agents, he was told that he was free to leave. But the agents also made clear that if he chose to leave, he would not be allowed

back in until the officers were "completely done." Ex. 4 at 7:00:25-7:00:40 a.m.  Mr. Rodriguez explained that he and his wife wanted to go to the store first thing to get WIC food for their baby. *Id.* at 7:00:45-7:00:55.  The agents assured him that they "shouldn't be here long" and that they just "had some questions." *Id.* at 7:00:55-7:01:05.  They also said he was not under arrest, and that nobody was under arrest. *Id.* at 7:01:18-7:01:25.  They then proceeded to interrogate Mr. Rodriguez for about twenty minutes.

Though the agents "recited" that Mr. Rodriguez was free to leave (but could not return) and that he was not under arrest, the police-dominated atmosphere overwhelmingly dictated otherwise.  Mr. Rodriguez had already been handcuffed—the universal symbol for being arrested—separated from his family, had weapons pointed at him, and was at the time sitting in an enclosed bedroom with two agents.  Ex. 1 at ¶¶5-11.  It is inconceivable that Mr. Rodriguez, or any other reasonable person, would have felt free to leave under such circumstances.  Thus, an officer's suggestion that he was free to leave was meaningless in this context.  In any case, where would he have gone?  All of his personal belongings were inside the house and in the custody of law enforcement.  He had not been provided a copy of the search warrant and so could not even ensure that officers were only searching for or seizing items pursuant to the court's authorization.

What happened immediately before Mr. Rodriguez's second interrogation is also critical.  When the second interrogation began, the officers had waited for him outside the bathroom door while he was using the restroom, and then escorted him back into the bedroom.  Ex. 6.  Again, they closed the bedroom door behind them.  Ex. 1 at ¶11.  They then informed Mr. Rodriguez that they found two phones in his Jeep.  Ex. 6.  This was after the first interrogation, in which the agents had asked for Mr. Rodriguez's consent to search the Jeep because (as they stated) the search warrant did not cover vehicles, and he had *explicitly withheld his consent*.  Ex. 4 at 7:11:08-7:11:36 a.m.  From Mr. Rodriguez's perspective, he had told the agents they could not search his car

14

and they did so anyway.  This simply adds to the coercive environment, as the agents were effectively communicating they could do whatever they wanted.

Given the context of this case, including what had occurred between Mr. Rodriguez's first and second interrogations, the fourth factor weighs in favor of a finding of custody.  Even if the Court finds that the final factor weighs against a finding of custody, as in *Craighead* the Court should still find Mr. Rodriguez was in custody and that the agents were required to *Mirandize* him.  *Craighead*, 539 F.3d at 1089; *see also Salceda*, 2012 WL 763583, at *4 (finding defendant was in custody even though he was told he was not under arrest); *Gladney*, 2009 WL 175157, at *7 (same where defendant was told he was not under arrest and free to leave; noting that "this only begs the question as to where he was suppose[d] to go").

*     *     *

Despite their clear and unmistakable obligation to advise Mr. Rodriguez of his *Miranda* rights before beginning a custodial interrogation, agents interrogated Mr. Rodriguez twice, without ever mentioning his right to an attorney and his right to remain silent.  The agents could have simply recited the *Miranda* warnings to Mr. Rodriguez prior to interviewing him.  There would have been no harm to doing so, even if the officers truly thought Mr. Rodriguez was not in custody.  Agents Whitman and Trapp are surely familiar with what *Miranda* warnings are; it would have taken fewer than 30 seconds to issue them.  The officers simply did not care to do it.  As a result, Mr. Rodriguez's March 9, 2018 statements must be suppressed.

### 3.    Apart from the *Miranda* Violation, Mr. Rodriguez's Statements were Involuntary

Even apart from the *Miranda* violation, Mr. Rodriguez's statements to the officers were involuntarily made in violation of the Fifth Amendment and due process.

"A defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . and even though there is ample

15

1    evidence aside from the confession to support the conviction." *Jackson v. Denno*, 378

2    U.S. 368, 376 (1964) (internal citation omitted).  The prosecution has the burden to

3    prove voluntariness.  *Lego v. Twomey*, 404 U.S. 477, 489 (1972).  In determining

4    whether a statement was voluntarily given, or was instead the involuntary product of

5    police coercion, courts employ the totality of the circumstances analysis first

6    announced in *Brown v. Mississippi*, 297 U.S. 278 (1936).  *See, e.g.*, *Arizona v.*

7    *Fulminante*, 499 U.S. 279, 285-86 (1991).  The question is whether "the government

8    obtained the statement by physical or psychological coercion or by improper

9    inducement so that the suspect's will was overborne."  *Harrison*, 34 F.3d at 890

10   (internal citations omitted).

11        For all the reasons set forth above, the government cannot meet its burden to

12   prove that Mr. Rodriguez's statements to police were voluntarily made.  By the time he

13   gave the statements, he had endured a terrifying, early morning invasion of his home,

14   watched his wife and infant son have guns pointed at them, sat handcuffed and

15   separated from his family in the back of a car, and twice been moved to an isolated

16   location for questioning about the most intimate details of his life.  A reasonable

17   person's will would naturally have been overborne by such traumatizing events.

18   Because Mr. Rodriguez's statements were involuntary, they were obtained in violation

19   of his due process rights.

20        **4.    The Search Warrant's Execution was Unreasonable, in**

21        **Violation of the Fourth Amendment**

22        "[W]hen it comes to the Fourth Amendment, the home is first among equals."

23   *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *see also Payton*, 445 U.S. at 589-90 (the

24   Fourth Amendment scrupulously guards the "right . . . to retreat" into one's own home).

25   Even when officers have a warrant to search a home, the Fourth Amendment's "general

26   touchstone of reasonableness . . . governs the method of execution of the warrant."

27   *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citation omitted).  As in all contexts,

28   the "reasonableness of a particular seizure depends not only on *when* it is made, but

1  also on *how* it is carried out." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  In

2  analyzing a Fourth Amendment challenge to a search warrant's manner of execution,

3  courts must balance "the legitimate law enforcement concerns at issue" against "the

4  individual privacy interests affected." *Richards v. Wisconsin*, 520 U.S. 385 (1997).

5       Courts have identified various factors to guide this inquiry, including: whether

6  the suspect is known to be violent or dangerous; the crime under investigation; the time

7  of day; whether the suspect poses a flight risk or a threat to officers; whether the

8  officers destroy or damage property; and the amount of time the officers waited before

9  committing a forcible entry.  *See, e.g.*, *Muehler v. Mena*, 544 U.S. 93, 99-100 (2005)

10  (use of handcuffs to detain a suspect during execution of search warrant was reasonable

11  where "a warrant authorize[d] a search for weapons and a wanted gang member

12  reside[d] on the premises," and there was a need to detain multiple occupants); *United

13  States v. Banks*, 540 U.S. 31, 38 (2003); *Ramirez*, 523 U.S. at 71; *Graham v. Connor*,

14  490 U.S. 386, 396 (1989); *Terebesi v. Torreso*, 764 F.3d 217, 231-242 (2d Cir. 2014);

15  *see also Estate of Smith v. Marasco*, 430 F.3d 140, 148-51 (3d Cir. 2005); *Holland ex

16  rel. Overdorff v. Harrington*, 268 F.3d 1179, 1190-94 (10th Cir. 2001); *Baker v.

17  Monroe Township*, 50 F.3d 1186, 1192-94 (3d Cir. 1995); *McDonald v. Haskins*, 966

18  F.2d 292, 295 (7th Cir. 1992); *United States v. Thompson*, 667 F. Supp. 2d 758, 765

19  (S.D. Ohio 2009) (unreasonable to make occupant sit in the sun for hours without pants

20  or undergarments while officers searched, without showing her the search warrant).

21       Here, the officers' early morning entry into Mr. Rodriguez's home violated his

22  Fourth Amendment rights in light of the early hour, the officers pointing rifles at Mr.

23  Rodriguez and his family, and the utter lack of any justification for such a display and

24  use of force.

25       *First*, with respect to the early hour, the officers arrived at Mr. Rodriguez's home

26  at 6:00 a.m., when they had every reason to believe that the occupants would be

27  sleeping, which indeed they were.  Ex. 2; Ex. 1 ¶4.  The officers had no reason to think

28  the residents would not be home or would attempt to flee if they arrived later.  There

was simply no reason for officers to arrive at dawn. That the officers had no concerns about flight is also evidenced by the fact that they had received the information purportedly establishing probable cause to search—the returns provided by the Kik messaging application—more than seven months before securing and executing the search warrant. *See generally* Motion to Suppress Evidence in Violation of the Fourth Amendment, ("Fourth Amendment Motion") filed concurrently herewith. Had the government been worried about flight or destruction of evidence, it would have acted more quickly to obtain and execute the warrant.

*Second*, the officers immediately invaded Mr. Rodriguez's home, by arriving in such large numbers (15 agents from 5 agencies) armed with weapons, and immediately pointing rifles at Mr. Rodriguez and his family once they entered the home. They also unnecessarily handcuffed Mr. Rodriguez and escorted him out of the house, separating him from the rest of this family. There is no explanation for this extreme of a response in a child pornography case, especially once based on 7-month-old information.

*Third* and finally, the amount of force displayed was both terrifying and wholly out of proportion to the circumstances. There was no reason to suspect that Mr. Rodriguez or any other resident was violent, dangerous, or likely to escape or destroy evidence. Indeed, Mr. Rodriguez has no criminal history. The evidence officers sought was expected to exist primarily on computers, where even deletion would not wipe it from devices' system memories, as the agent's warrant application acknowledged. *See* Ex. 1 to Fourth Amendment Motion at USAO 525 ¶ 4(b)(i) ("The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized."). Thus, neither the nature of the evidence nor the occupants of the apartment justified the force displayed.

In short, there was no justification for the officers to train their weapons on Mr. Rodriguez and his family in the early morning hours, terrifying them and rousing them from sleep. The government's method of execution violated the Fourth Amendment.

18

## C.    Exclusion of All Evidence and Statements is an Appropriate Remedy for the *Miranda* Violations, Lack of Voluntariness, and Grossly Unreasonable Manner of Search

The exclusionary rule "forbids the use of improperly obtained evidence at trial" when doing so would produce a net benefit to society by deterring illegal police conduct. *Herring v. United States*, 555 U.S. 135, 139 (2009) (internal quotation omitted). It "is designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Id.* at 139-40 (cleaned up). If the benefits of deterrence would outweigh any costs to society, exclusion is appropriate.

That balance unquestionably requires exclusion here. The agents' method of executing the search warrant exceeded any conception of what was reasonable or necessary in these circumstances. Nothing suggested Mr. Rodriguez or anyone else in the home had a history of violence that would necessitate such tactics. And the need to deter law enforcement's overuse of violent raids is clear from their distressingly frequent use in recent years. *See generally* Kevin Sack, *Door-Busting Drug Raids Leave a Trail of Blood*, N.Y. Times, March 18, 2017, *available at* https://nyti.ms/3fZCwM9, last visited June 23, 2024 ("[A]t least 81 civilians and 13 law enforcement officers" died in SWAT raids involving both no-knock and knock-and-announce warrants from 2010 through 2016); *Bellotte v. Edwards*, 629 F.3d 415, 418-19 (4th Cir. 2011) (late-night tactical entry with guns); *United States v. Cantu*, 230 F.3d 148, 150-53 (5th Cir. 2000) (middle-of-the-night raid by officers in ski masks, who tried to pry the door open with a crowbar).

Law enforcement's use of unjustified and dangerous methods demands a correspondingly robust sanction: exclusion of the resulting evidence. Deterring needlessly violent and aggressive police entries into homes will protect officers and civilians alike by decreasing the likelihood that startled suspects will respond in violent self-defense, while sparing defendants the indignity of being jolted out of sleep by police. No meaningful cost to society weighs against this conclusion. Applying the

19

exclusionary rule would merely mean police must execute searches in reasonable ways, and respect suspects' *Miranda* rights.

**D. Any Evidence Obtained From Mr. Rodriguez's Statements Must Also Be Suppressed.**

The exclusionary rule extends to all evidence resulting from the unconstitutional search or seizure. *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (*en banc*); *United States v. Millan*, 36 F.3d 886, 890 (9th Cir. 1994) (results of interrogation and search had to be suppressed, because they were the direct result of an illegal stop). Here, that evidence includes the statements Mr. Rodriguez made as a result of the agents' unreasonable, coercive, and un-*Mirandized* questioning. Any evidence derived from those statements must also be suppressed. *See Wong Sun v. U.S.*, 371 U.S. 471, 487-88 (1963).

## IV. CONCLUSION

For the foregoing reasons, Mr. Rodriguez respectfully requests that this Court grant his motion and suppress his statements to law enforcement.


Respectfully submitted.

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:   June 24, 2024          By  */s/ Terra Castillo Laughton*
                                                   TERRA CASTILLO LAUGHTON
                                                   Deputy Federal Public Defender

20

# **INDEX OF EXHIBITS**

| Ex. 1 | Declaration of Rene Rodriguez |
|-------|-------------------------------|
| Ex. 2 | FBI Report, produced in discovery as USAO 2389 |
| Ex. 3 | Redfin, Trulia, and Zillow listings of 3052 W. Cheryllyn Lane |
| Ex. 4 | Recorded Interrogation of Mr. Rodriguez (First Interrogation, Part 1) |
| Ex. 5 | Recorded Interrogation of Mr. Rodriguez (First Interrogation, Part 2) |
| Ex. 6 | Recorded Interrogation of Mr. Rodrigeuz (Second Interrogation) |

CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
TERRA D. CASTILLO LAUGHTON (Bar No. 321683)
(E-Mail: Terra_Laughton@fd.org)
Deputy Federal Public Defender
411 W. Fourth St., Suite 7110
Santa Ana, California 92701
Telephone: (714) 338-4500
Facsimile: (714) 338-4520

Attorneys for Defendant
RENE RODRIGUEZ

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 8:23-cr-00123-DOC |
| Plaintiff, | **DECLARATION OF TERRA CASTILLO LAUGHTON IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS DEFENDANT'S STATEMENTS AND RELATED EVIDENCE** |
| v. | |
| RENE RODRIGUEZ. | |
| Defendant. | |

1

## DECLARATION OF TERRA CASTILLO LAUGHTON

I, Terra D. Castillo Laughton, hereby state and declare as follows:

1.    I am an attorney with the Office of the Federal Public Defender for the Central District of California.  I am licensed to practice law in the State of California and I am admitted to practice in this Court.  I have been appointed to represent Defendant Rene Rodriguez in the above-captioned case.

2.    Filed concurrently with this declaration as **Exhibit 1** is a true and correct copy of Mr. Rodriguez's signed declaration in support of his Motion to Suppress under the Fifth Amendment.  This declaration, required under Local Criminal Rule 12-1.1, is provided pursuant to *Simmons v. United States*, 390 U.S. 377, 390-394 (1968), and Mr. Rodriguez does not waive his Fifth Amendment privilege.

3.    Filed concurrently with this declaration as **Exhibit 2** is a true and correct copy of an FBI report the government produced in discovery in this case as USAO_2389.

4.    Filed concurrently with this declaration as **Exhibit 3** is a true and correct copy of excerpts of the publicly-available Redfin, Trulia, and Zillow webpages for 3052 West Cheryllyn Lane in Anaheim, California that my office printed on June 18, 2024.

5.    Lodged concurrently with this declaration as **Exhibit 4** is a true and correct copy of a video produced by the government in discovery as USAO_004.

6.    Lodged concurrently with this declaration as **Exhibit 5** is a true and correct copy of a video produced by the government in discovery as USAO_005.

7.    Lodged concurrently with this declaration as **Exhibit 6** is a true and correct copy of a video produced by the government in discovery as USAO_007.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on June 24, 2024 at Santa Ana, California.

*Terra Castillo Laughton*

TERRA D. CASTILLO LAUGHTON

2